DOYLE LOWTHER LLP
WILLIAM J. DOYLE II (SBN 188069)
bill@doylelowther.com
JAMES R. HAIL (SBN 202439)
jim@doylelowther.com
10200 Willow Creek Road, Suite 150
San Diego, CA 92131
Telephone: (858) 935-9960

Steven J. Purcell (admitted *pro hac vice*)
LEVI & KORSINSKY, LLP
30 Broad Street, 24th Floor
New York, New York 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-6510

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YACOV TURGEMAN, derivatively on behalf of OREXIGEN THERAPEUTICS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> MICHAEL A. NARACHI, JOSEPH P. HAGAN, HEATHER D. TURNER, ECKARD WEBER, LOUIS C. BOCK, BRIAN H. DOVEY, PATRICK MAHAFFY, PETER K. HONIG, WENDY DIXON, JOSEPH S. LACOB, MICHAEL F. POWELL, and DANIEL K. TURNER III, <br><br> Defendants, <br><br> -and- <br><br> OREXIGEN THERAPEUTICS, INC, <br><br> Nominal Defendant. | Case No. 13CV2959 JAH MDD <br><br> **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> Date: July 27, 2015 <br> Time: 2:30 p.m. <br> Dept: 13B <br> Judge: Hon. John A. Houston |

# **TABLE OF CONTENTS**

STATEMENT OF FACTS ........................................................................................1

    A. Parties ...........................................................................................................1

    B. Terms of the Plan.........................................................................................1

    C. The excess awards .......................................................................................2

    D. Plaintiff's Demand.......................................................................................2

    E. Proceedings .................................................................................................4

ARGUMENT ........................................................................................................4

    I.   The Motion should be denied because Plaintiff adequately alleged the Board's refusal of the Demand was wrongful and in bad faith..........................4

       A. The Board's refusal was wrongful because the Board lacked authority to grant the awards Plaintiff challenged in the Demand. .............................5

       B. The excess awards to Narachi, Hagan, and Turner violated the Plan............8

          i.  Section 3.3 is not limited to awards the Board intended to qualify as performance-based compensation under Section 162 (m). .................8

          ii.  The awards granted before June 2, 2011 count towards the 1.5 million share limit. ..................................................................11

       C. Defendants' strained interpretations of the Plan do not matter because the challenged awards were intended to comply with Section 162(m). ......12

    II.  Plaintiff has alleged a valid breach of contract claim........................................13

    III. The breach of contract claim is timely. ..........................................................20

    IV. Plaintiff has adequately pled a breach of fiduciary duty, unjust enrichment, and waste of corporate assets. ......................................................21

    V.  Plaintiff's claims are not moot..........................................................................22

CONCLUSION.....................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Adams v. United States Forest Serv.,*
  671 F.3d 1138 (9th Cir. 2012)................................................................5

*Allen v. El Paso Pipeline GP Co., L.L.C.,*
  90 A.3d 1097 (Del. Ch. 2014)........................................................*passim*

*Andersen v. Dept. of Admin. Services,*
  1992 Del. LEXIS 263 (Del. July 7, 1992)........................................11, 23

*Asarco, LLC v. Union Pac. R.R. Co.,*
  765 F.3d 999 (9th Cir. 2014)..............................................................20

*Bader v. Anderson,*
  179 Cal. App. 4th 775 (Cal. App. 6th Dist. 2009) ...............................19

*Beard Research, Inc. v. Kates,*
  8 A.3d 573 (Del. Ch. 2010)................................................................21

*Brehm v. Eisner,*
  746 A.2d 244 (Del. 2000)................................................................4, 5

*Cal. Pub. Emps.' Ret. Sys. v. Coulter,*
  2002 Del. Ch. LEXIS 144 (Del. Ch. Dec. 18, 2002) ....................7, 14, 24

*Cantor Fitzgerald, L.P. v. Cantor,*
  1999 Del. Ch. LEXIS 134 (Del. Ch. June 15, 1999) ............................23

*Citron v. Fairchild Camera & Instrument Corp.,*
  569 A.2d 53 (Del. 1989)....................................................................6

*Feldman v. Cutaia,*
  951 A.2d 727 (Del. 2008)..................................................................19

*Gantler v. Stephens,*
  965 A.2d 695 (Del. 2009)....................................................................7

*Gressman v. Brown,*
  C.A. 9896-VCLG (Del. Ch. Jul. 17, 2014) .........................................19

*Grimes v. DSC Comm'ns. Corp.,*
  724 A.2d 561 (Del. Ch. 1998)..............................................................5

*Halpert v. Zhang,*
  2013 U.S. Dist. LEXIS 111565 (D. Del. Aug. 1, 2013) ................6, 22, 24

*Harbor Fin. Partners v. Huizenga*,
751 A.2d 879 (Del. Ch. 1999) ..................................................................7

*In re Activision Blizzard, Inc. S'holder Litig.*,
2015 Del. Ch. LEXIS 140 (Del. Ch. May 20, 2015) .............................17

*In re Brocade Communs. Sys. Derivative Litig.*,
615 F. Supp. 2d 1018 (N.D. Cal. 2009) .................................................20

*In re Honeywell Int'l Inc. Derivative Litigation*,
C.A. 8469-CS (Del. Ch. Dec. 16, 2013) ...........................................*passim*

*Jackson Nat'l Life Ins. Co. v. Kennedy*,
741 A.2d 377 (Del. Ch. 1999) ................................................................22

*Kalageorgi v. Victor Kamkin, Inc.*,
750 A.2d 531 (Del. Ch. 1999) ................................................................24

*Kamen v. Kemper Fin. Servs.*,
500 U.S. 90 (1991) ....................................................................................4

*Kramer v. Western Pacific Industries, Inc.*,
546 A.2d 348 (Del. 1988).......................................................................18

*La. Mun. Police Emps. Ret. Sys., et al. v. Bergstein, et al.*,
C.A. No. 7764-VCL (Del. Ch. Oct. 14, 2013) ...................................*passim*

*Lillis v. AT&T Corp.*,
2007 Del. Ch. LEXIS 102 (Del. Ch. July 20, 2007) .............................10

*MCG Capital Corp. v. Maginn*,
2010 Del. Ch. LEXIS 87 (Del. Ch. May 5, 2010) .................................17

*Michelson v. Duncan*,
407 A.2d 211 (Del. 1979)........................................................................24

*Mt. Moriah Cemetery v. Moritz*,
1991 Del. Ch. LEXIS 68 (Del. Ch. Apr. 4, 1991)...................................5

*NRDC v. Jewell*,
749 F.3d 776 (9th Cir. 2014)...................................................................22

*Pfeiffer v. Leedle*,
2013 Del. Ch. LEXIS 272 (Del. Ch. Nov. 8, 2013)...............................21

*Phoenix Cash & Carry, LLC v. United States Smokeless Tobacco Brands, Inc.*,
2008 U.S. Dist. LEXIS 93416 (D. Ariz. Nov. 7, 2008).........................15

*Ryan v. Gifford*,
918 A.2d 341 (Del Ch. 2007)..................................................................22

*San Antonio Fire & Police Pension Fund v. Bradbury*,
  2010 Del. Ch. LEXIS 218 (Del. Ch. Oct. 28, 2010) ................................. 18

*Sanders v. Wang*,
  1999 Del. Ch. LEXIS 203 (Del. Ch. Nov. 8, 1999) ........................................ *passim*

*Scattered Corp. v. Chicago Stock Exch.*,
  701 A.2d 70 (Del. 1997) .................................................................... 4, 5

*Schock v. Nash*,
  732 A. 2d 217 (Del. 1999) .................................................................. 22

*Spiegel v. Buntrock*,
  571 A.2d 767 (Del. 1990) .................................................................... 5

*Steinhardt v. Howard-Anderson*,
  2012 Del. Ch. LEXIS 1 (Del. Ch. Jan. 6, 2012) ................................... 23

*Sun-Times Media Grp., Inc. v. Black*,
  954 A.2d 380 (Del. Ch. 2008) .............................................................. 9

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
  845 A.2d 1031 (Del. 2004) ................................................... 14, 16, 17, 18

*Wavedivision Holdings, LLC v. Millennium Digital Media Sys., L.L.C.*,
  2010 Del. Ch. LEXIS 194 (Del. Ch. Sept. 17, 2010) ............................ 15

*Weiss v. Swanson*,
  948 A.2d 433 (Del. Ch. 2008) .............................................. 7, 14, 21, 22

*Zen Invs., LLC v. Unbreakable Lock Co.*,
  276 F. App'x 200 (3d Cir. 2008) ......................................................... 23

**Rules**

Fed. R. Civ. P. 15(c)(1)(B) .................................................................... 20

Fed. R. Civ. P. 23.1 ......................................................................... 5, 21

1

2

## STATEMENT OF FACTS

### A. Parties

Plaintiff Yacov Turgeman ("Plaintiff") is, and has been continuously, a shareholder of Orexigen Therapeutics, Inc. ("Orexigen" or the "Company") since February 2011. (¶ 9.)[1] Nominal Defendant Orexigen is a biopharmaceutical company incorporated in Delaware focused on the development of pharmaceutical products for the treatment of obesity. (¶ 10.) Defendant Michael A. Narachi ("Narachi") is the Company's Chief Executive Officer and President, and has served on the Company's Board of Directors (the "Board") since 2009. (¶ 11.) Defendant Joseph P. Hagan ("Hagan") has been Chief Business Officer of the Company since June 2011 and the Company's acting-Chief Financial Officer since March 2011. (¶ 21.) Defendant Heather D. Turner ("Turner") has been Senior Vice President, General Counsel, and Secretary of the Company since May 2010. (¶ 22.) Defendants Narachi, Hagan, and Turner are the recipients of the stock awards at issue. (¶ 3.) At the time this lawsuit was commenced, Orexigen's Board comprised defendants Narachi, Eckard Weber, Louis C. Bock, Wendy Dixon, Brian H. Dovey, Patrick J. Mahaffy, and Peter K. Honig. (¶¶ 11-17.) Each member of the Board, as well as Defendants Joseph S. Lacob, Michael F. Powell, and Daniel K. Turner III, were members of Orexigen's Board at the time the challenged awards were granted.[2] (¶¶ 18-20, 23.)

### B. Terms of the Plan

In 2007, the 2007 Equity Incentive Award Plan (the "Plan) was adopted by the Board and approved by Orexigen's shareholders. (¶ 24.) The Plan permits the Board, through its Compensation Committee (the "Compensation Committee"), to grant stock options, restricted stock, stock appreciation rights, restricted stock units and other stock-based awards to the Company's employees, directors and consultants. (*Id.*) In

---

[1] All references to "¶" are to the Verified Shareholder First Amended Derivative and Class Action Complaint (the "Amended Complaint" or "Compl.").

[2] The term "Defendants" refers to all defendants except nominal defendant Orexigen.

- 1 -

clear and unambiguous language, the Plan limits the maximum number of shares the Board may grant to an individual in any given fiscal year to 1.5 million. (¶¶ 26-27.) Section 3.3 of the Plan states in relevant part:

> Notwithstanding any provision in the Plan to the contrary, and subject to Article 11, **the maximum number of shares of Stock with respect to one or more Awards that may be granted to any one Participant during any fiscal year** of the Company (measured from the date of any grant) **shall be 1,500,000**[.]

(¶ 27 (emphasis added); *see also* Compl. Ex., C § 3.3.)

## C. The excess awards

In the 2011 fiscal year, Orexigen's Board, through its Compensation Committee, issued Narachi a total of 4,318,950 shares under the Plan, 2,818,950 shares in excess of the 1,500,000 fiscal-year limit. (¶ 29.) The Board granted Narachi: (1) 258,150 stock options on January 18, 2011; (2) 1,800,000 stock options on June 10, 2011; and (3) 2,260,800 stock options through an exchange offer, pursuant to which Company employees were allowed to exchange underwater stock options (*i.e.*, stock options with an exercise price greater than the market price of the underlying stock) for a new grant of stock options ("Exchange Offer"). (*Id.*) The Compensation Committee also made three grants to both Hagan and Turner in fiscal year 2011. (¶ 30.) Hagan and Turner each received 107,000 stock options on January 18, 2011, and 450,000 stock options on June 10, 2011. (*Id.*) Pursuant to the Exchange Offer, Hagan exchanged 952,000 underwater stock options and Turner exchanged 1,093,396 underwater stock options. (*Id.*) In total, the Board granted Hagan 1,509,000 shares and Turner 1,650,396 shares in fiscal year 2011. (*Id.*) Hagan's 2011 shares exceeded the 1.5 million share limit by 9,000 shares and Turner's 2011 shares exceeded the 1.5 million share limit by 150,396 shares. (*Id.*)

## D. Plaintiff's Demand

On May 22, 2013, Plaintiff made a written demand on the Board (the "Demand"), calling for the Board to: (1) rescind the excess awards granted to Narachi,

Hagan, and Turner in 2011; (2) investigate whether additional violations of the Plan's 1.5 million share limit occurred; and (3) adopt adequate internal controls to prevent future violations of the Plan. (¶ 37; Compl., Ex. A.) On September 26, 2013, the Board directed Plaintiff to a Form 8-K the Company filed with the U.S. Securities and Exchange Commission ("SEC") on September 23, 2013 (the "Form 8-K"), which described actions the Board took in rejecting the Demand. (¶ 38; Compl., Ex. B.)

Following receipt of the Demand, the Board formed a Demand Review Committee (the "Review Committee") consisting of purportedly independent directors who were asked to conduct an investigation of the allegations made in the Demand. (¶ 39 (citing Form 8-K at 2).) After this investigation, the Review Committee determined the excess awards Plaintiff identified were "validly approved under the Plan." (*Id.* (quoting Form 8-K at 2).) In reaching this conclusion, the Review Committee took the position that the 1.5 million share limit "only applie[d] to awards or the portion thereof intended to qualify as performance-based compensation under Section 162(m) of the Internal Revenue Code." (¶ 41 (quoting Form 8-K at 2).) The Review Committee also concluded the 1.5 million share limit "became effective as of June 2, 2011," and the shares granted to Narachi, Hagan, and Turner before that date "did not count toward" the 1.5 million share limit. (Form 8-K at 2.) The awards granted to Hagan between June 2 and December 31, 2013, the Review Committee further concluded, did not exceed the 1.5 million share limit, and while the awards granted to Narachi and Turner did, their awards "were validly approved under the Plan" with the "the portion of those awards in excess of the [1.5 million share limit] . . . not qualify[ing] as performance-based compensation under Section 162(m)." (*Id.*)

In the Form 8-K, the Company revealed the Compensation Committee had, with the Board's approval, amended the Plan following the Board's receipt of Plaintiff's Demand:

> (i) to clarify that the 1,500,000 share limit set forth in Section 3.3 of the Plan as to the number of shares of the Company's common stock with

respect to which one or more stock awards may be granted to any one eligible participant during any fiscal year of the Company (the "162(m) Award Limit") only applies to awards or the portion thereof intended to qualify as performance-based compensation under Section 162(m) of the Internal Revenue Code ("Section 162(m)"); and (ii) to confirm that the Compensation Committee has the authority to make awards in excess of the 162(m) Award Limit[.]

(*Id.*) The Company deemed the amendment retroactive to June 10, 2011, the exact date the Board had issued excess awards to Narachi, Hagan, and Turner. (*Id.*)

**E. Proceedings**

Plaintiff filed an initial complaint on December 9, 2013. On July 23, 2014, Defendants moved to dismiss. On March 9, 2015, the Court granted Defendants' motion to dismiss and gave Plaintiff 30 days to file an amended complaint. On April 8, 2015, Plaintiff filed the Amended Complaint.

## <u>ARGUMENT</u>

In refusing the Demand, the Board deliberately chose not to rescind awards it lacked authority to make in the first place. The excess awards to Narachi, Hagan, and Turner were issued in direct violation of the express and unambiguous 1.5 million fiscal-year limit in the Plan. As shown below, the Board's knowing refusal to undo such *ultra vires* awards is wrongful because the Plan is a contract with shareholders with which the Board must comply.

**I.    The Motion should be denied because Plaintiff adequately alleged the Board's refusal of the Demand was wrongful and in bad faith.**

In a demand refused case, like this one, the relevant question on a motion to dismiss is whether the board's decision to refuse the demand is protected by the business judgment rule.[3] *Scattered Corp. v. Chicago Stock Exch.*, 701 A.2d 70, 74 (Del. 1997), *overruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Under Delaware law, a shareholder-plaintiff may maintain a derivative action

---

[3] Because Orexigen is incorporated in Delaware, Delaware substantive law applies. *See Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 108-09 (1991).

on behalf of a corporation after the board has refused a pre-suit demand if he adequately pleads "that the board's rejection of the demand was wrongful." *Mt. Moriah Cemetery v. Moritz*, 1991 Del. Ch. LEXIS 68, at *8 (Del. Ch. Apr. 4, 1991). A shareholder meets this pleading burden by alleging "with particularity facts sufficient to create a reasonable doubt that the corporation's board wrongfully refused the demand." *Grimes v. DSC Comm'ns. Corp.*, 724 A.2d 561, 565 (Del. Ch. 1998). In determining whether a board wrongfully refused a demand, courts assess the "good faith and the reasonableness of the [board's] investigation." *Scattered Corp.*, 701 A.2d at 75.

While Fed. R. Civ. P. 23.1 imposes a heightened pleading standard for alleging wrongful refusal of a demand, "the pleader is not required to plead evidence." *Brehm*, 746 A.2d at 254. Rather, a complaint adequately sets forth a claim for relief when it alleges "particularized factual statements that are essential to the claim." *Id*. Furthermore, at the motion to dismiss stage, a court must accept the allegations of a complaint as true while drawing all reasonable inferences in favor of plaintiff. *Adams v. United States Forest Serv.*, 671 F.3d 1138, 1142-43 (9th Cir. 2012).

### A. The Board's refusal was wrongful because the Board lacked authority to grant the awards Plaintiff challenged in the Demand.

As the Court correctly recognized in its order granting Defendants' first motion to dismiss (D.I. 47 at 5), the "wisdom" underlying a board's decision to reject a demand is generally not addressed in demand-refused cases. *See Spiegel v. Buntrock*, 571 A.2d 767, 777 (Del. 1990). This is because a board's refusal of a demand is typically protected by the business judgment rule. *See Scattered Corp.*, 701 A.2d at 74; *see also Spiegel*, 571 A.2d at 777 ("Absent an abuse of discretion, if the requirements of the traditional business judgment rule are met, the board of directors' decision not to pursue the derivative claim will be respected by the courts."). Generally, in order to rebut the presumption of the business judgment rule, a plaintiff must allege facts establishing either "director self-interest, if not self-dealing, or that the directors either lacked good

faith or failed to exercise due care." *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 64 (Del. 1989) (citation omitted).

But this is not the only means of rebutting an alleged business judgment. Instead a shareholder may show the board acted outside the scope of its discretionary authority when refusing a demand. *See Allen v. El Paso Pipeline GP Co.*, L.L.C., 90 A.3d 1097, 1108 (Del. Ch. 2014). Such a showing necessarily rebuts the protections of the business judgment rule because "[b]oards of directors have no discretion to exceed the intra-entity limitations on their authority . . . [as t]he possession of discretionary authority is a prerequisite for the policy-based deference of the business judgment rule. Without authority to take the action in question, a board has no business judgment to exercise." *Id.*

A board lacks "discretionary authority" to take actions that would violate an unambiguous provision in a shareholder-approved compensation plan, for such a plan is an intra-entity limitation on its discretionary authority. Courts have repeatedly held that where a plaintiff pleads that a board has violated a clear and unambiguous provision of a shareholder-approved plan, as is the case here, that party overcomes the presumption that the board was acting within the scope of its authority and exercising valid business judgment. *See, e.g.*, *Sanders v. Wang*, 1999 Del. Ch. LEXIS 203, at *15 (Del. Ch. Nov. 8, 1999) (allegations that board awarded more shares than allowed under shareholder-approved compensation plan "cast doubt that the board's alleged acts could be the result of a valid exercise of business judgment"). As one court recently explained in this exact context, where the particularized allegations show "a clear violation [of a shareholder-approved plan]," that violation "alone, gives rise to a reasonable doubt that the [transaction was] a valid [exercise] of business judgment." *Halpert v. Zhang*, 2013 U.S. Dist. LEXIS 111565, at *415 (D. Del. Aug. 1, 2013) (quotations omitted)). Reasonable doubt arises because "the [business judgment] rule applies to the directors' grant of options pursuant to a stockholder-approved plan *only*

*when the terms of the plan* at issue *are adhered to*." *Weiss v. Swanson*, 948 A.2d 433, 441 (Del. Ch. 2008) (emphasis added). In other words, "[a]ny action of the board that falls outside the rather broad scope of its authority is not entitled to the protection of the business judgment rule." *Cal. Pub. Emps.' Ret. Sys. v. Coulter*, 2002 Del. Ch. LEXIS 144, at *40 (Del. Ch. Dec. 18, 2002).

Because a board lacks the "discretionary authority" to violate a shareholder-approved compensation plan, it follows that a board also lacks the "discretionary authority" to reject a demand to remedy such a violation. Allowing a board to reject such a demand is at odds with the fundamental precept that a board cannot act outside its "discretionary authority." As the current Chief Justice of the Delaware Supreme Court has explained, when an underlying demand establishes that a board took an action it was "not contractually permitted to do without a stockholder vote . . . [t]he [b]oard itself can't validate [the action] . . . by refusing a demand." Transcript of Oral Argument at 81-82, *La. Mun. Police Emps. Ret. Sys., et al. v. Bergstein, et al.*, C.A. No. 7764-VCL (Del. Ch. Oct. 14, 2013) (attached as Ex. A to Steven J. Purcell Declaration ("Purcell Decl.")).[4] Thus, it is not within the purview of "the business judgment of the board to determine, ultimately, their own authority." *Id* at 97. Indeed, it is well established that shareholder approval is required to ratify a board action that exceeds the board's legal authority. *See, e.g.*, *Gantler v. Stephens*, 965 A.2d 695, 713 n.54 (Del. 2009) ("The only species of claim that shareholder ratification can validly extinguish is a claim that the directors lacked the authority to take action that was later ratified."); *Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 896 (Del. Ch. 1999) (holding that shareholder consent is necessary to ratify *ultra vires* acts).

Here, Plaintiff alleges sufficient particularized facts that demand was wrongfully refused. Plaintiff contends the excess awards to Narachi, Hagan, and Turner violated

---

[4] Chief Justice Leo Strine made these statements while sitting in his previous capacity as Chancellor of the Delaware Court of Chancery.

the Plan, which Defendants themselves effectively admit. (¶¶ 29-31, 42-44.) As such, the Board had no "discretionary authority" to refuse the Demand, and the Board's refusal of the demand was therefore wrongful as a matter of law. *See Allen*, 90 A.3d at 1108; *Bergstein* at 81-82

In its prior dismissal order, the Court observed that Plaintiff "focuse[d] on the merits of the challenged grant of stock options" and not on the process or the due care exercised by the Board in responding to the Demand. (D.I. 47 at 5.) The merits of the stock option grants, however, cannot be separated from the Board's refusal of the Demand, for no amount of process or due care can provide the Board with "discretion" to exceed plain limitations on their authority. *See Allen*, 90 A.3d at 1108; *Sanders*, 1999 Del. Ch. LEXIS 203, at *15

Accordingly, if Plaintiff has sufficiently alleged Defendants exceeded their authority under the Plan, he has necessarily alleged that Demand was wrongfully refused. That is, as shown below, precisely what Plaintiff alleges.

**B. The excess awards to Narachi, Hagan, and Turner violated the Plan.**

  i.  *Section 3.3 is not limited to awards the Board intended to qualify as performance-based compensation under Section 162 (m).*

Section 3.3 of the Plan prohibits the Board from granting more than 1.5 million shares to any individual per fiscal year. (*See* Plan 3.3.) In an attempt to escape the plain meaning of Section 3.3, when confronted with the violation, Defendants claimed the Plan somehow meant something other than what it plainly says. According to Defendants, the 1.5 million share limit applies only to awards "intended to qualify as performance-based compensation under" Section 162(m) of the Internal Revenue Code. (Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss Plaintiff's Verified Shareholder Derivative Complaint ("Defs.' First Mem.") at 7 (quoting Form 8-K at 2); *see also* Defendants' Memorandum of Points and Authorities in Support of Motion to Dismiss Plaintiff's Verified Shareholder First

Amended Derivative and Class Action Complaint ("Defs.' Mem.") at 12-13 (relying on Court's prior order).) That position finds no support in the Plan's plain text. (Compl. ¶¶ 42-48.)

Defendants' interpretation of the Plan is not based on the Plan's express language. Section 3.3 states, without ambiguity, that "the maximum number of shares of Stock with respect to one or more Awards that may be granted to any one Participant during any fiscal year of the Company (measured from the date of any grant) shall be 1,500,000." Nothing in the Plan states or even implies Section 3.3 is limited only to those awards "the Board intends" to qualify as performance-based compensation under Section 162 (m)," as Defendants claim.

Indeed, Defendants' argument directly contradicts what the Board told Orexigen's shareholders when it asked them to approve the Plan. When seeking shareholder approval of amendments to the Plan in June 2011, the Board told shareholders that one "important aspect" of the Plan was the fact that Section 3.3 imposed a "reasonable limit" of 1.5 million shares per fiscal year that applied to **all** awards:

> **Important Aspects of the Amended 2007 Plan Designed to Protect our Stockholders' Interests**
>
> * * *
>
> *Reasonable limit on equity awards*. The Amended 2007 Plan limits the number of shares of common stock available for equity awards such that no employee may be granted an equity award covering more than to 1,500,000 shares in a fiscal year.

(¶ 43 (quoting Orexigen's Schedule 14A Proxy Statement (the "2011 Proxy") at 24) (emphasis in original).) Defendants are bound by what they told shareholders when seeking their approval of the Plan. *See, e.g.*, *Sun-Times Media Grp., Inc. v. Black*, 954 A.2d 380, 398-99 (Del. Ch. 2008) (finding that defendants' past interpretation of a bylaw provision, one that occurred prior to the start of the litigation, was "compelling" evidence as to meaning of that provision); *Lillis v. AT&T Corp.*, 2007 Del. Ch. LEXIS

102, at *58-59 (Del. Ch. July 20, 2007) (finding prior letter where defendant agreed with plaintiff's interpretation of a term in a stock option plan "significant" in determining that term's meaning).

Insofar as Defendants seek to rely on Section 13.3(i) and (j) of the Plan to support their litigation-driven interpretation, their reliance is misplaced. (Defs.' Mem. at 4.) Sections 13.3(i) and (j) provide that the Compensation Committee has the sole power to "interpret the terms of, and any matter arising pursuant to, the Plan or any Award Agreement" and to "all other decisions and determinations that may be required pursuant to the Plan . . . [or] to administer the Plan[.]" In *Sanders*, the Delaware Court of Chancery specifically rejected the argument that such boilerplate provisions allow a company's compensation committee to ignore clear and unambiguous provisions in a shareholder-approved compensation plan. There, much like here, the defendants argued they could ignore a share limit in the compensation plan because a section of the plan gave the board's compensation committee "broad authority to interpret and administer the [p]lan to carry out its objectives[.]" *Sanders*, 1999 Del. Ch. LEXIS 203, at *29. The Delaware court rejected this argument and held the compensation committee could not "ignore a clear . . . share limit" simply because the plan gave the committee authority to interpret and administer the plan, as administering a plan is one thing, but "fundamentally altering its substantive terms is quite another." *Id.* at *22, *29. The same reasoning holds true here. To allow the Compensation Committee to violate the 1.5 million share limit under the guise of interpreting the Plan is contrary to the underlying contractual foundation of shareholder-approved compensation plans, which impose limits on a board's discretionary authority.

The Board also points to its amendment of Section 3.3 following receipt of Plaintiff's Demand, but this serves only to confirm that Section 3.3 applied to all awards under the Plan before the Board changed its language. As stated in the Form 8-K, the Compensation Committee, with the Board's approval, amended Section 3.3 so

that it now provides: "the maximum number of shares of Stock with respect to one or more Awards that may be granted to any one Participant as Qualified Performance-Based Compensation during any fiscal year of the Company (measured from the date of any grant) shall be 1,500,000." (¶ 45.) In the Form 8-K, the Company explained that the new language was added "to clarify that the 1,500,000 share limit set forth in Section 3.3 of the Plan . . . only applies to awards or the portion thereof intended to qualify as performance-based compensation under Section 162 (m) of the Internal Revenue Code." (*Id.*) Because this amendment created two different types of awards (those intended to comply with Section 162(m) and those that are not) when previously there was only one, this amounts to much more than the mere "clarification" claim by Defendants.

ii.   *The awards granted before June 2, 2011 count towards the 1.5 million share limit.*

Defendants also argue that because the 1.5 million share limit "first became effective as of June 2, 2011," the awards issued between January 1, 2011 and June 1, 2011 do not count towards the limit. (Defs.' First Mem. at 6 (quoting Form 8-K at 2).) As with their other arguments, Defendants' position is contrary to the express terms of the Plan and is nothing more than an attempt to add a new term to Section 3.3. *See Andersen v. Dept. of Admin. Services*, 1992 Del. LEXIS 263, at *6-7 (Del. July 7, 1992) (rejecting proffered contract interpretation which would in effect add a new term to the contract). Section 3.3 does not state that only shares issued after June 2, 2011 count towards the 1.5 million share limit. Rather, Section 3.3 makes clear the 1.5 million share limit is a "fiscal year" limit with the fiscal year being "measured from the date of any grant." (Compl., Ex. C § 3.3.) Because the challenged stock awards issued to Narachi, Hagan, and Turner after June 1, 2011 were all issued within a fiscal year of the awards they received on January 18, 2011, the challenged awards issued after June

1, 2011 are counted for purposes of whether the Board violated the 1.5 million share limit.

### C. Defendants' strained interpretations of the Plan do not matter because the challenged awards were intended to comply with Section 162(m).

Even if the Court accepts Defendants' interpretation of the Plan, the motion to dismiss should be denied because the challenged awards were intended to be tax-deductible under Section 162(m). In Orexigen's Schedule 14A Proxy Statement filed in advance of the Company's 2012 annual meeting of shareholders (the "2012 Proxy"), the Board represented to Orexigen's shareholders that all stock options issued under the Plan were intended to "qualify as performance-based compensation" under Section 162 (m). (¶ 47 (citing 2012 Proxy at 45).) In the 2012 Proxy the Board told shareholders that:

> Section 162(m) of the Code, generally disallows a tax deduction to public companies for compensation in excess of $1 million paid to certain of our executive officers. Qualifying performance-based compensation will not be subject to the deduction limitation if certain requirements are met.

> With the exception of compensation paid to Mr. Narachi, the non-performance based compensation paid in cash to our executive officers in 2010 did not exceed the $1 million limit per officer. In addition, our 2007 equity incentive award plan has been structured so that **any compensation paid in connection with the exercise of option grants under that plan with an exercise price equal to the fair market value of the option shares on the grant date will qualify as performance-based compensation.** Therefore, it will not be subject to the $1 million deduction limitation.

(*Id.*) (emphasis added). Accordingly, even if Section 3.3 applies only to awards intended to be tax-deductible, as Defendants claim, the above disclosure demonstrates the 2011 awards to Narachi, Hagan, and Turner – which consisted of option grants with an exercise price equal to fair market value on grant date – were made in violation of the Plan.

## II.    Plaintiff has alleged a valid breach of contract claim.

Defendants' various attempts to explain why the Plan is not a contract cannot be reconciled with controlling Delaware law. As the Court of Chancery stated in *Sanders*:

> The Plan here is simply a contract between . . . shareholders (which includes plaintiffs), on one hand, and the defendant board of directors (which includes the management Participants), on the other. One party to the contract (plaintiffs) claims that the other party (defendants, some of whom are beneficiaries, some of whom are fiduciaries under the contract) committed a single act (awarding excess shares) in clear violation of a specific provision of the contact (the share ceiling in § 3.1).

*Sanders*, 1999 Del. Ch. LEXIS 203, at *6.

The Delaware Court of Chancery recently re-affirmed that a shareholder-approved compensation plan is a contract in *In re Honeywell Int'l Inc. Derivative Litigation*, C.A. 8469-CS (Del. Ch. Dec. 16, 2013) (TRANSCRIPT) (attached as Ex. B to Purcell Decl.). As in *Sanders* and the instant case, *Honeywell* involved an alleged violation of a provision in a shareholder-approved compensation plan that limited the number of shares an individual could receive under the plan. In ruling on the parties' dispositive motions, the Delaware Court of Chancery held that the plaintiff's claim was "a contract claim[,]" and explained that "stockholders have a right to have their contractual expectations met." *Id.* at 109. Although the plaintiff in *Honeywell* brought her claims derivatively on behalf of the company, the Court concluded that "a claim by stockholders that the board acted beyond its legal authority was a direct claim" enforceable by the shareholders in their own right. *Id.* at 107. The court explained:

> It's always been my understanding that if the board -- if there's a claim by a stockholder that the board has acted beyond its authority under the bylaws or charter or contract, that they get to complain about it directly, and the question of authority is decided by the Court. And this implicates contractual voting rights, too, because, for example, the plan here -- and this will become important in the part of my ruling that the plaintiffs are probably not going to like quite as much – is that this was a plan put to the stockholders for their approval. Contractual limits are important to

stockholders. It says what the board's realm of permissible action is, and it also says, therefore, what the realm of permissible action is not.

*Id.* at 108.

Although the plaintiffs in *Sanders* and *Honeywell* elected to bring derivative claims, this does not mean direct claims could not have been brought instead of or in addition to the derivative claims. They could have been, as the Delaware Court of Chancery confirmed in *Allen*. There, the court considered a motion to certify a class consisting of all common unit holders of a partnership to pursue direct claims against the defendants, the partnership's controlling general partner, and the general partner's board of directors, based on allegations that the defendants failed to comply with the requirements of the partnership agreement governing transactions involving the general partner. *Allen*, 90 A.3d at 1098, 1100. The defendants opposed the plaintiff's motion on the grounds the alleged claims were "exclusively derivative" rather than direct. *Id.* at 1098. The court disagreed, concluding that the plaintiff's claims were direct under the test enunciated in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004) (discussed further below). *Allen*, 90 A.3d at 1111. In reaching this conclusion, the court concluded that "[s]tockholders . . . can sue directly to enforce a constraint on the board's authority." *Id.* at 1107. As the court explained:

> Looked at from the opposite perspective, precisely because directors have wide discretion to act within their legal authority, stockholders have a right to insist that directors not take action beyond the limits of that authority. To overlay stockholders' contractual rights with a presumption that boards determine when those rights can be asserted would conflict with our law's long-standing protection of stockholder rights, of which voting rights are an important but by no means exclusive example. Stockholders can assert those rights directly, without first seeking permission from the board.

*Id.* (footnote omitted).

In reaching its conclusion, the *Allen* court described *Sanders* and its progeny, including *Coulter* and *Weiss*, as decisions "hold[ing] that when a board violates contractual limits on its authority, that decision is not a business judgment to which deferential fiduciary duty review applies, rendering demand futile under the second

- 14 -

prong of" *Aronson[v. Lewis*, 473 A.2d 805 (Del. 1984)]." *Id.* at 20 n.6. While acknowledging that these cases were brought derivatively and thus decided "within the framework of a demand futility analysis," the *Allen* court stated that "in [its] view, the same reasoning demonstrates that the claim is [direct]." *Id.*

Here, the Plan is a contract between shareholders and the Board, which requires the Board to issue equity awards only in strict accordance with the Plan's provisions. In granting more than 1,500,000 stock options to Narachi, Hagan, and Turner during a fiscal year, the Board violated the Plan and gave rise to a cause of action for breach of contract. This cause of action belongs to the shareholders, not the Company, because the Board's promise to award shares only in accordance with the terms of the Plan was a promise made directly to the shareholders.[5]

Defendants deny Plaintiff's direct right to enforce the Plan and instead attempt to characterize the contract claim as purely a derivative claim. (Defs.' Mem. at 15-21.) In doing so, Defendants simply ignore *Allen* and *Honeywell*, and casually dismiss *Sanders*. As those cases establish, Plaintiff and the other shareholders have a direct cause of action against the Board by virtue of the Board breaching its contractual obligations.

In determining whether claims are derivative or direct, Delaware courts are guided by a two-part inquiry: "(1) who suffered the alleged harm (the corporation or

---

[5] Neither *Wavedivision Holdings, LLC v. Millennium Digital Media Sys., L.L.C.*, 2010 Del. Ch. LEXIS 194 (Del. Ch. Sept. 17, 2010) nor *Phoenix Cash & Carry, LLC v. United States Smokeless Tobacco Brands, Inc.*, 2008 U.S. Dist. LEXIS 93416 (D. Ariz. Nov. 7, 2008) apply because, unlike here, these cases did not involve a dispute between shareholders and a board of directors or touch upon issues of corporate governance. Rather *Wavedivision Holdings, LLC* involved one broadband cable operator suing a competitor for allegedly breaching a contract regarding the sale of a cable broadband systems. 2010 Del. Ch. LEXIS 194, at *1-2. *Phoenix Cash & Carry, LLC* involved an alleged breach of contract between a tobacco producer and a distributer. In contrast, *Sanders*, *Honeywell*, and *Allen*, all of which involve a dispute between shareholders (or unitholders) and a board, make clear that a shareholder-approved compensation plan, like the Plan, is a contract between a company's board and its shareholders.

the suing shareholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Tooley*, 845 A.2d at 1033. Plaintiff's breach of contract claim (Count IV) is a direct claim under this inquiry.

Plaintiff and other shareholders have been harmed by virtue of the Board breaching its contractual obligations. *Sanders*, *Honeywell*, and *Allen*, make clear that shareholders suffer harm when a board violates a contractual limit on its authority, such as a shareholder-approved compensation plan. *See, e.g.*, *Honeywell* at 108; *see also Bergstein* at 189 (explaining that when a board violates a shareholder-approved compensation plan "[t]he harm is that the shareholders were told – the harm is that [the board] made a *contractual promise*. And if [the directors] breach [the plan], I think harm is presumed" (emphasis added)). Not only did the Board violate the Plan, it contradicted its representation to the shareholders in the 2011 Proxy that Section 3.3 applied to **all** awards. (¶ 43.) Plaintiff also sufficiently satisfies prong two of *Tooley* because Orexigen's shareholders will benefit by the Board being forced to abide by its contractual obligation. *Cf. Sanders*, 1999 Del. Ch. LEXIS 203, at *39 ([W]ith the shareholder franchise often quite dispersed, it is critical as a matter of governance policy that this Court ensure that these compensation plans when approved by shareholders are administered in strict accordance with the terms of the Plan and as the shareholders had the right to anticipate.").

Because the violation of the Plan harmed Orexigen and Orexigen would receive a benefit if Plaintiff recovers, Defendants argue that Plaintiff cannot allege a direct claim. (Defs.' Mem. at 15-16.) Defendants, however, ignore that *Tooley* is not a mutually exclusive inquiry. A company and its shareholders can both be harmed by the same director misconduct, which can accordingly give rise to direct and derivative claims simultaneously. *MCG Capital Corp. v. Maginn*, 2010 Del. Ch. LEXIS 87, at

*47 (Del. Ch. May 5, 2010) ("Under Delaware law, it is possible for the same set of facts to generate both a direct claim and a derivative claim.").

A recent illustration of this principle occurred in *In re Activision Blizzard, Inc. S'holder Litig.*, 2015 Del. Ch. LEXIS 140 (Del. Ch. May 20, 2015). In that case, a company's controlling shareholder sold almost all of its company stock to the company at a below-market price; however, rather than sell exclusively to the company, the controller also sold a significant portion of its company stock at the same below-market discount to a group of insiders, giving them practical control over the company. *Id.* at *16-21. Plaintiff argued, among other things, the insiders breached their fiduciary duties by forcing the company and the controller to allow them to purchase the below-market stock. *Id.* at *23-25, *72. In approving the settlement of that case, the Delaware Court of Chancery stated that certain of the plaintiff's breach of fiduciary duty claims were "dual claims," meaning that they were both derivative and direct claims, and that, accordingly the answer to both prongs of the *Tooley* inquiry were "either and both." *Id.* at *64, * 69.

With respect to the first *Tooley* prong, the court stated the company was harmed because the "defendants' misconduct prevented [it] from repurchasing a greater percentage of its shares from [the controller]," but that the shareholders were also harmed "because they lost the opportunity to have control return to the market" as opposed to control being transferred from the controller to the group of insiders. *Id.* at *72. With respect to the second *Tooley* prong, the court found that "[o]ne set of possible remedies would operate at the corporate level and include damages in favor of [company,]" while "another set of possible remedies would operate at the stockholder level, such as an order invalidating some or all of [the insiders'] shares," which would eliminate the insiders' control over the company. *Id.* at *74. Here, while Defendants insist that there is harm involving only the Company, they do not explain what that

harm is, nor why the Board's failure to abide by a promise made to shareholders does not result in harm to the shareholders.

In any event, even if a remedy for the violation of the Plan might flow to both the shareholders and the Company, it simply means that *Tooley's* first prong controls. In *Allen*, the court held that because the second prong of *Tooley* did not point definitively to the claim being direct or derivative as "the remedy could support a derivative characterization or a direct characterization[,]" that "the first *Tooley* factor [took] on added significance, as [did] the longstanding recognition in *Tooley* and other decisions that investors can sue directly for violations of their contractual rights." *Allen*, 90 A.3d at 1111.[6]

Instead of addressing *Sanders*, *Honeywell*, and *Allen* which are all factually analogous, Defendants seek to rely on a line of inapposite cases. (*See* Defs.' Mem. at 16-21.) Defendants cite *Kramer v. Western Pacific Industries, Inc.*, 546 A.2d 348 (Del. 1988), in which the plaintiff challenged a board of directors' decision to grant stock options and golden parachutes to management prior to a buy-out merger. 546 A.2d at 349-50. In attempting to allege a direct injury, plaintiff claimed that his share of proceeds from the buy-out had been reduced by the resources used to pay for the challenged transactions. *Id.* In assessing these allegations and concluding that the harm alleged was derivative in nature, the court found the "gravamen of Kramer's complaint is mismanagement resulting in waste of corporate assets." *Id.* at 353; *see also Tooley*, 845 A.2d at 1038 (noting that "[t]he claim in *Kramer* was essentially for

---

[6] Defendants argue Plaintiff's breach of contract claim fails because the directors "are not personally liable for the breach of a corporate contract[.]" (Defs.' Mem. at 20.) But Defendants ignore that Plaintiff seeks injunctive and equitable relief, and thus whether the Board could be found personally liable is immaterial. *See San Antonio Fire & Police Pension Fund v. Bradbury*, 2010 Del. Ch. LEXIS 218, at *32 (Del. Ch. Oct. 28, 2010) (holding that although the "allegations could have given rise to a derivative action," where the complaint sought injunctive, prospective, or declaratory relief, the claim was direct). (Compl., Prayer for Relief, Items E and F.)

mismanagement of corporate assets"). But the plaintiff in *Kramer* did not allege, as Plaintiff does here, that the board lacked authority to issue the stock awards at issue.

Defendants also cite *Feldman v. Cutaia*, 951 A.2d 727 (Del. 2008) (Defs.' Mem. at 17-18), where the plaintiff similarly filed an amended complaint challenging certain corporate transactions following a merger. *Id.* at 728-29. Although the plaintiff's claims were dismissed on standing grounds, Defendants completely ignore that the "direct claim" that plaintiff appealed was his breach of fiduciary duty claim, not his contract claim. *Id.* at 730 n.6. The Delaware Supreme Court never reached the question of whether plaintiff's breach of contract claim could have been maintained as a direct claim following the merger. The Delaware Supreme Court also noted that "[t]he only harm alleged" under plaintiff's purported direct claims was "exactly the same" as the harm plaintiff had alleged in connection with his derivative claims, specifically, "a harm generated by corporate overpayment," which is a fundamentally derivative harm. *Id.* at 733. Here, in contrast, Plaintiff is not alleging a direct claim for breach of fiduciary duty and alleges that he and the other shareholders have been harmed because of the Board's breach of the Plan, which by definition involves "something other than an injury resulting from a wrong to the corporation." *Id.* at 734; *see also Bergstein* at 189-90.

Defendants rely on *Gressman v. Brown*, C.A. 9896-VCLG (Del. Ch. Jul. 17, 2014) (Defs.' Mem. at 18), which is not to the contrary. In *Gressman*, the court did not reach the issue of whether a shareholder could bring a breach of contract claim based on a violation of a shareholder-approved compensation plan because the court found that such a claim would fail for the same reason the derivative claim failed – the board of directors had not violated the company's shareholder-approved compensation plan in the first place. *Id.* at 61. Defendants fare no better citing *Bader v. Anderson*, 179 Cal. App. 4th 775 (Cal. App. 6th Dist. 2009), a case that addresses California, not Delaware, law. *Id.* at 793, 800-02. Although *Bader* cited some Delaware authority, it relied

exclusively on California law in holding that direct and derivative actions "are mutually exclusive: *i.e.* the right of action and recovery belongs to either the stockholders (direct action) or the corporation (derivative action)[,]" which as demonstrated above is directly contrary to Delaware law. *Id.* at 793.

### III.   The breach of contract claim is timely.

Defendants are incorrect that Plaintiff's breach of contract claim is barred by the statute of limitations. Fed. R. Civ. P. 15(c)(1)(B) provides that "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading[.]" A claim arises from the same conduct, transaction, or occurrence if it "will likely be proved by the same kind of evidence offered in support of the original pleading." *Asarco, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014) (citation omitted). "The relation back doctrine of Rule 15(c) is liberally applied." *Id.* (citation omitted).

Here, Plaintiff's breach of contract claim arises from the same conduct, transaction, or occurrence as his breach of fiduciary claims because both claims are based on the Board's issuance of excess awards to Narachi, Hagan, and Turner in violation of the Plan in 2011. (¶¶ 29-31, 64-65, 84-85.) *See In re Brocade Communs. Sys. Derivative Litig.*, 615 F. Supp. 2d 1018, 1038-39 (N.D. Cal. 2009) (holding that claims "focus[ing] on misstatements made in internal documents" in amended complaint related back to original complaint involving allegations of "false and misleading financial statements" because both complaints focused on same transactions, *i.e.*, "stock option grants made from 1999 through 2004"). Since the claims asserted in the initial complaint were timely, so, too, are the related claims asserted in the Amended Complaint.

**IV.     Plaintiff has adequately pled a breach of fiduciary duty, unjust enrichment, and waste of corporate assets.**

A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty. *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010). Where a plaintiff pleads particularized facts sufficient to satisfy the requirements of Rule 23.1 "that plaintiff *a fortiori* rebuts the business judgment rule for the purposes of surviving a motion to dismiss pursuant to Rule 12(b)(6)." *Weiss*, 948 A.2d at 448; *see also Pfeiffer v. Leedle*, 2013 Del. Ch. LEXIS 272, at *32 (Del. Ch. Nov. 8, 2013) ("The standard under Rule 12(b)(6) is less stringent than that under Rule 23.1. Thus, where plaintiff alleges particularized facts sufficient to prove demand futility under the second prong of *Aronson*, that plaintiff a fortiori rebuts the business judgment rule for the purpose of surviving a motion to dismiss pursuant to Rule 12(b)(6)." (citations omitted)). Plaintiff meets this standard.

Defendants argue that Plaintiff has not stated a claim for breach of fiduciary duty because "the Amended Complaint contains virtually no allegations regarding any individual defendants' state of mind let alone any well-pled facts establishing that any individual defendant acted with an intent to violate the law[.]" (Defs.' Mem. at 23.) This argument is without merit because allegations that a board violated an unambiguous provision of a compensation plan are sufficient to "infer that such violation was committed knowingly or intentionally[.]" *Pfeiffer*, 2013 Del. Ch. LEXIS 272, at *20-21. Defendants' argument also ignores that Plaintiff made a demand before commencing litigation. Thus, even if the initial violation was somehow unintentional, the Board's decision to refuse the Demand removed all possible doubt as to whether the Board acted with knowledge of the Plan's terms and Plaintiff's contentions concerning the challenged awards.

Plaintiff also pleads sufficient facts to establish a claim for unjust enrichment. Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice

or equity and good conscience." *Schock v. Nash*, 732 A. 2d 217, 232-33 (Del. 1999) (internal quotation marks omitted). The existence of an unjust enrichment claim follows logically from a properly pled breach of fiduciary duty claim. *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 394 (Del. Ch. 1999) ("Having pleaded sufficiently the allegations [of] breach of fiduciary duty . . . it is axiomatic that Plaintiffs have likewise pleaded sufficiently the allegations that Defendants were enriched by their actions [and it is therefore] likely they will also be able to prove that neither [Defendant] can retain any benefit resulting from the disputed transaction."); *Ryan v. Gifford*, 918 A.2d 341, 361 (Del Ch. 2007) (retention of challenged options constituted unjust enrichment at expense of corporation); *Weiss*, 948 A.2d at 449-50 (same).

Finally, Plaintiff also alleges sufficient facts to state a claim for waste. Waste occurs where there has been an "exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Weiss*, 948 A.2d at 450 (internal citation omitted). Having sufficiently pleaded that the Board exceeded its authority under the Plan by issuing the excess awards to Narachi, Hagan, and Turner, Plaintiff pleads these grants did not benefit Orexigen and therefore constituted waste. *See Halpert*, 2013 U.S. Dist. LEXIS 111565, at *20-22; *Sanders*, 1999 Del. Ch. LEXIS 203, at *2.

## V.   Plaintiff's claims are not moot.

Defendants' claim that this action is now moot based on the amendment to the Plan is meritless. (*See* Defs.' Mem. at 24-25.) An action is moot only when events have occurred since the commencement of a lawsuit that prevent the court from granting plaintiff effective relief. *See NRDC v. Jewell*, 749 F.3d 776, 782 (9th Cir. 2014) (en banc). Nothing of the sort has occurred here. The excess awards to Narachi, Hagan, and Turner are still in place. Rather than taking action to rescind those improper awards, the Board simply approved a purportedly retroactive amendment to Section

3.3 that Defendants now claim "cured" the Board's violation of the 1.5 million share limit. (*See* Defs.' Mem. at 24.)

Contrary to Defendants' position, the purportedly retroactive amendment does not "cure" anything. Actions taken in excess of the shareholders' grant of authority are invalid absent shareholder ratification. If the Board lacked the authority to issue more than 1.5 million shares, then it necessarily follows that the Board lacked the authority to "cure" its violation of that limit by simply amending the Plan retroactively without seeking approval from shareholders. Any other result would fundamentally undermine the ability of shareholders to enforce limitations on the authority of corporate boards. *See Bergstein* at 81-82. Defendants point to Section 15.1 as the basis of the Board's power to retroactively amend the Plan. (*See* Defs.' Mem. at 4.) However, while Section 15.1 provides that the Board can amend the Plan, nothing in Section 15.1 states that the Board has the power to retroactively amend the Plan to "cure" a violation. Absent a specific provision allowing for such retroactive amendments, the Court should decline Defendants' request to read such a provision into the Plan. *See Andersen*, 1992 Del. LEXIS 263, at *6-7.

Moreover, as a general rule, fiduciaries do not have a license to expunge a breach of fiduciary duty as if it never happened simply by attempting to "undo" the breach when caught. To the contrary, "[t]he breach of duty is complete and cannot be undone." *Steinhardt v. Howard-Anderson*, 2012 Del. Ch. LEXIS 1, at *30 (Del. Ch. Jan. 6, 2012) (breach of fiduciary duty claim not mooted by subsequent conduct). Many courts have reached the same conclusion. *See*, *e.g.*, *Zen Invs., LLC v. Unbreakable Lock Co.*, 276 F. App'x 200, 202 (3d Cir. 2008) (breach of fiduciary duty claim arising from wrongful cancellation of plaintiff's stock not rendered moot by defendants' "decision to belatedly relinquish the contested shares"); *Cantor Fitzgerald, L.P. v. Cantor*, 1999 Del. Ch. LEXIS 134, at *27 (Del. Ch. June 15, 1999) (denying motion to dismiss breach of fiduciary duty claims as moot where "only aspect that has changed with regard to

these defendants is that their alleged breaches are no longer ongoing breaches[,]" which had no effect on relief plaintiff sought to redress the misconduct).

Defendants' mootness argument also appears primarily to rest on the premise that Plaintiff has sought nothing more than a rescission, or "cure," of the excess awards. As even a cursory review of the Amended Complaint shows, this is not the case. Plaintiff also seeks additional forms of relief, including damages and reformation of Orexigen's corporate governance and internal procedures. (*See* Compl., Prayer for Relief, Items D, E, F, and H.) Further, while Defendants claim that a "subsequent violation [of the 1.5 million share limit] is not likely to occur," this is nothing more than a self-serving conclusion. (Defs.' Mem. at 24.) The Board has done nothing other than simply amend the 1.5 million share limit to conform to its prior actions. This is not a change in Orexigen's corporate governance procedures, and does nothing to ensure that the Board will not violate the Plan again in the future.

The cases Defendants cite do not support their claim that Plaintiff's claims are moot. *Michelson v. Duncan*, 407 A.2d 211 (Del. 1979), is not applicable because that case involves shareholder ratification, not as here an attempt at board ratification. *Id.* at 214. *Kalageorgi v. Victor Kamkin, Inc.*, 750 A.2d 531 (Del. Ch. 1999), is likewise inapplicable because that case involved a board retroactively curing an issue that fell "within the board's *de jure* authority." *Id.* at 540. Plaintiff does not contest that "where board authorization of corporate action that falls within the board's *de jure* authority is defective, the defect in authority can be cured retroactively by board ratification." *Id.* That is not the case here, however, as the Board did not have *de jure* authority to issue the excess awards and thus lacked the authority to retroactive "cure" them without approval from shareholders. *See Halpert*, 2013 U.S. Dist. LEXIS 111565, at *415; *Coulter*, 2002 Del. Ch. LEXIS 144, at *40; *Sanders*, 1999 Del. Ch. LEXIS 203, at *15.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' motion to dismiss in its entirety.

Dated: June 8, 2015

Respectfully submitted,


    /s/ Steven J. Purcell
    Steven J. Purcell

LEVI & KORSINSKY, LLP
Steven J. Purcell (admitted *pro hac vice*)
30 Broad Street, 24th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171


DOYLE LOWTHER LLP
William J. Doyle II
James R. Hail
10200 Willow Creek Road, Suite 150
San Diego, CA 92131
Tel: (858) 935-9960
Fax: (858) 939-1939
email: bill@doylelowther.com
jim@doylelowther.com


*Attorneys for Plaintiff*

- 25 -